[Cite as *Jardim v. Jardim*, 2023-Ohio-4797.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Adilson O. Jardim

    Appellee/Cross-appellant

v.

Emily J. Jardim

    Appellant/Cross-appellee

Court of Appeals No. L-23-1039

Trial Court No. DR 2016-0249

**DECISION AND JUDGMENT**

Decided: December 27, 2023

* * * * *

Rebecca E. Shope and Matthew T. Kemp,
for Appellee/Cross-appellant

Andrew R. Mayle and Benjamin G. Pandanilam,
for Appellant/Cross-appellee

* * * * *

**SULEK, J.**

{¶ 1} Appellant Emily Jardim appeals the judgment of the Lucas County Court of

Common Pleas, Domestic Relations Division, denying her motion to receive one-half of

the value of unvested restricted stock units ("RSUs") that were awarded during her

divorce. Appellee Adilson Jardim cross-appeals the trial court's judgment awarding

distribution of funds from the respective attorneys' IOLTA accounts. For the reasons that follow, the trial court's judgment is affirmed.

## I. Factual Background and Procedural History

{¶ 2} This matter involves post-divorce proceedings. On November 20, 2018, the trial court entered its final judgment of divorce. The trial court subsequently amended that entry on May 29, 2019, with a nunc pro tunc order. And while neither party appealed the judgment of divorce, they have since litigated various aspects of the judgment. For purposes of this appeal, the primary issue is the division and distribution of marital property in the form of RSUs that Adilson earned from his employment at Splunk, Inc.

{¶ 3} During the parties' marriage, Adilson received six grants of RSUs from Splunk that contained certain conditions or time periods after which the RSUs would "vest." Upon vesting, the RSUs would be included as income on Adilson's paystub and taxes would be withheld from that amount.

{¶ 4} During the two years of divorce litigation, the parties agreed that Adilson would sell some of the vested RSUs. A portion of the proceeds was used to pay certain marital obligations and the remaining amount was divided into the parties' respective attorneys' IOLTA accounts.

{¶ 5} In the final judgment of divorce, the trial court ordered that Adilson pay Emily one-half of the value of his remaining unvested Splunk RSUs "at the time of their

2.

vesting, but after [Adilson] pays his tax liabilities and [Emily] will be responsible to pay her own tax liabilities upon the receipt of the monies."

{¶ 6} In March 2020, Adilson left his employment at Splunk to join Salesforce, where he received a compensation package that included $500,000 worth of Salesforce RSUs. As a result of Adilson's decision to leave Splunk, approximately 8,000 unvested Splunk RSUs were cancelled. The parties dispute the exact value of the cancelled RSUs, but had they vested, their worth was estimated to be in the neighborhood of one million dollars.

{¶ 7} Following the November 20, 2018 judgment of divorce, Emily filed motions seeking to hold Adilson in contempt for, inter alia, failing to distribute money from the sale of vested RSUs and failing to pay spousal support. In addition, Emily argued that Adilson committed financial misconduct under R.C. 3105.171(E)(4) by "conspiring" with Salesforce to intentionally dissipate the unvested RSUs. As a result of Adilson's alleged financial misconduct, Emily sought compensation for her half of the unvested RSUs that were cancelled when Adilson left his employment at Splunk.

{¶ 8} As to the issue of spousal support, the judgment of divorce ordered Adilson to pay $6,700.00 per month. The parties, however, disagreed over the duration of the spousal support. Adilson believed that it was for three years between March 2018 and March 2021, but Emily understood that it was for approximately five years between April 2016 and March 2021. It is undisputed that Adilson is current on the spousal support

3.

payments that began in March 2018.[1]  Emily was only seeking the approximately

$150,000 that she believed was owed to her for the period from April 2016 to March

2018.  While the parties continued to litigate the issue, they separately agreed that spousal

support would be extended through September 2021.

{¶ 9} The issues came before a magistrate for hearing in December 2021.  Emily

presented the expert testimony of Avi Beliak, a certified public accountant and forensic

accounting manager for Rehmann.  Rehmann conducted a forensic accounting

investigation of the RSU grants and concluded that between March 2018 and March

2020, $1.7 million worth of vested RSUs were disbursed and $500,000 in taxes withheld,

leaving $1.2 million of which Emily was entitled to half, or $600,000.  Furthermore, the

Rehmann report concluded that the 8,073 unvested RSU grants, which were cancelled in

March 2020 when Adilson voluntarily left Splunk's employment, had a value of over $1

million based on Splunk's stock price on the day they were cancelled.  The report

concluded that Emily should be entitled to half of the potential value of the cancelled

stocks, or approximately $500,000.

{¶ 10} In opposition, Adilson presented the expert testimony of Mark

Mockensturm, a lawyer and certified public accountant.  Mockensturm testified that

Rehmann's calculations were incorrect because they included RSU grants that occurred

---

[1] Due to the final judgment of divorce not being entered until November 2018, Adilson originally had a sizeable arrearage for the months from March 2018 to November 2018. Adilson has since paid that arrearage.

4.

after the parties' divorce and which were not marital property. In addition, Mockensturm testified that Rehmann improperly used the tax withholding from Adilson's paystubs to determine the amount of tax liability generated from the RSU disbursements. Instead, Mockensturm prepared Adilson's taxes with and without the RSU disbursements to determine that the RSU disbursements created an actual tax liability of approximately $700,000. Regarding the unvested RSUs, Mockensturm testified that they did not have any monetary value because it is a future right that the employee has no control over. Mockensturm, therefore, concluded that the amount due to Emily was $424,621.

{¶ 11} Adilson also testified regarding the circumstances of his change in employment. He stated that in late 2019, Splunk brought in new leadership. As a result, a number of members of Adilson's team left the company and Adilson became concerned about the company's direction and whether he would retain his job. Around that time, several other employers began recruiting Adilson. A former colleague approached him about joining Salesforce and after several meetings and discussions he accepted an offer. Adilson testified that his compensation package, which included expected annual earnings of $420,000 and an initial grant of $500,000 in RSUs, was consistent with the market for someone at his level.

{¶ 12} Finally, the parties testified regarding money that should be shifted from the equal division of the proceeds from the sales of the vested Splunk RSUs. Adilson testified that $424,621 was deposited into each IOLTA account, minus each party retaining $100,000 for various living and litigation expenses. The money in the IOLTA

5.

accounts was to be used to pay marital obligations, with the remainder being split evenly between the parties. Adilson asserted that Emily improperly received funds from her attorney's IOLTA account, which she used to pay her individual obligation to satisfy the mortgage and provide Adilson his share of the equity in the marital home. Adilson also testified that the entirety of the 2018 tax liability, with the exception of some small estimated quarterly payments, was paid out of his IOLTA account when it should have been shared by the parties. Emily, for her part, testified that the tax payments made out of her attorney's IOLTA account were not authorized, and she sought the return of those funds.

{¶ 13} Following the hearing, the magistrate entered her decision on May 19, 2022. As to the division of the vested RSUs, the magistrate found Rehmann's report to be unreliable, and instead relied upon Mockenstrum's conclusion that each party was entitled to $424,621 from the vested RSUs. The magistrate further concluded that the unvested RSUs had no value to divide. The magistrate also rejected Emily's claims that Adilson committed financial misconduct and concluded that Adilson left his employment "for several legitimate reasons and not in an effort to dissipate assets." Those reasons included that the Salesforce position was higher paying and that the changes at Splunk could have led to Adilson losing his job. The magistrate remarked, "To require [Adilson] to stay at a job until such time as all RSUs vested and pass up new and/or better opportunities would basically force [Adilson] into an indentured servitude."

6.

{¶ 14} Regarding the division of funds in the IOLTA accounts, the magistrate concluded that the intent of the divorce judgment was for an equal division of the funds remaining in those accounts. The magistrate found that funds were improperly disbursed from both accounts. From Adilson's account, the magistrate found that Emily was entitled to half of the funds used to pay $3,000 of Adilson's attorney's fees, $318.75 used to terminate a trust, $143,799 used to pay Adilson's 2018 federal tax liability, and $11,471.10 used to pay Adilson's 2018 state tax liability. From Emily's account, the magistrate found that Adilson was entitled to half of the $158,431.34 that was released to Emily, which she used to pay off the mortgage and to give Adilson his share of the equity in the marital residence. The magistrate concluded, "This results in a wash and therefore neither party is owed money from the monies remaining in the IOLTA accounts at the time of the divorce."

{¶ 15} On the issue of spousal support, the magistrate concluded that the divorce judgment awarded spousal support for three years from March 2018 through March 2021. The magistrate, however, ordered an extension of spousal support because Adilson had continued to receive income from RSUs for the last three years, and because "[d]ue to [Adilson's] career change, several RSUs were cancelled, RSUs that may have continued to vest through 2023, and [Emily] would have received one half the value of any RSUs that did vest." Therefore, the magistrate determined that spousal support of $6,700 per month should continue through December 31, 2023.

7.

{¶ 16} Adilson did not file any objections to the magistrate's decision; however, Emily filed objections challenging, inter alia, the magistrate's decisions on the value and division of the unvested RSUs and the division of funds in the IOLTA accounts.

{¶ 17} On January 26, 2023, the trial court entered its judgment overruling Emily's objections, in part, and sustaining them, in part. On the value and division of the unvested RSUs, the trial court overruled Emily's objections, holding that Emily was not entitled to any compensation. The court reasoned that "restricted stock units are unsecured, unfunded promises by Splunk to issue shares of common stock in the future provided the vesting criteria are satisfied by [Adilson]. * * * [T]he RSUs have no intrinsic value and/or no tangible value until vesting is complete at which time the employee is issued shares of common stock, the vesting date." Because the RSUs did not vest, there was no value to distribute. Further, the court held that Adilson did not commit financial misconduct under R.C. 3105.171(E)(4) when he left Splunk to take the position at Salesforce because the statute only applies to spouses and Adilson and Emily had not been spouses for approximately two years.

{¶ 18} On the division of funds in the IOLTA accounts, the trial court sustained Emily's objections. It found that instead of being a "wash," Emily was entitled to $9,942.01, representing the amount that was paid from IOLTA funds for Adilson's 2018 first quarterly estimated federal and state taxes, which were his sole financial responsibility.

8.

## II. Assignments of Error

{¶ 19} Emily timely appealed the trial court's January 26, 2023 judgment, asserting one assignment of error for review:

> The trial court erroneously ruled that appellant Emily Jardim was not entitled to any compensation for restricted stock units, which were previously determined to be marital property, that her ex-husband knowingly cancelled by changing employment to another job featuring similar units whose value upon vesting he intends to retain solely for himself.

{¶ 20} Adilson cross-appealed the trial court's January 26, 2023 judgment, and also asserts one assignment of error for review:

> The trial court erred in its January 25, 2023 (sic) judgment entry (at 11-12) in ordering Adilson to pay Emily $9,942.01 from the marital funds that had been generated by the sale of vested RSUs, and in failing to order Emily to pay Adilson $79,294.42 from the same funds.

## III. Analysis

### A. Emily's Assignment of Error

{¶ 21} In her assignment of error, Emily asserts that the trial court erred when it did not award her one-half of the value of the cancelled Splunk RSUs. In support, Emily presents two arguments. First, she contends that the trial court erred when it ruled that the unvested Splunk RSUs had no value. Second, she contends that the trial court's

decision is inequitable because it allowed Adilson to benefit from the Splunk RSUs while she could not.

{¶ 22} As to whether the unvested Splunk RSUs had any value, Emily cites a number of cases to demonstrate that unvested RSUs do have value for the purposes of the division of marital property. The circumstances here are consistent with those decisions in that the unvested RSUs may have had some value at the time of the divorce judgment, but that fact does not advance Emily's cause because the issue in this case is what happened to the property *after* it was divided.

{¶ 23} In *Daniel v. Daniel*, 139 Ohio St.3d 275, 2014-Ohio-1161, 11 N.E.3d 1119, ¶ 11, the Ohio Supreme Court discussed the two different approaches courts have taken regarding the division of pension benefits. One is "the 'present cash value' method, which requires the court to place a value on the benefit as of the date of the final decree and divide that value between the parties." *Id.* The other is "the 'deferred distribution' method, in which the court devises a formula for dividing the monthly benefit at the time of the decree, but defers distribution until the benefits become payable." *Id.*

{¶ 24} Here, the trial court seemingly utilized a deferred distribution method, awarding Emily one-half of the value of the Splunk RSUs "at the time of their vesting." In so doing, the court treated the unvested RSUs as marital property subject to division consistent with *Daniel*. *See id.* at ¶ 10 ("[I]t may be difficult to ascertain the value of benefits that have not yet vested and may never vest. But it does not follow that those future benefits have no value."); *Anderson v. Anderson*, 12th Dist. Warren No. CA2019-

10.

10-118, 2020-Ohio-4415, ¶ 11; *Duffy v. Duffy*, 540 S.W.3d 821, 827-828 (Ky.App.2018). Thus, to the extent that the unvested Splunk RSUs had some value at the time of the judgment of divorce, they were considered marital property and that property was split evenly between the parties. But, Emily was only entitled to realize the value of her one-half of the RSUs "at the time of their vesting."

{¶ 25} Utilizing the deferred distribution method is not without risk. As noted by the Ohio Supreme Court,

> When a trial court decides that a pension or retirement asset shall be paid by deferred distribution, it has created a situation where the parties' affairs are not concluded. The non-employed spouse may be placed in a position where he or she must monitor the fund, which may also create problems for the plan administrator. Although this alternative divides the risk between the parties that the benefits will fail to vest or mature, as an example, there is nothing to prevent an employed spouse, for whatever reason, from quitting his or her employment and becoming employed elsewhere. Likewise, the nonemployed spouse bears the risk that the employed spouse will die and the expected benefits, before being vested or matured, will terminate.

*Hoyt v. Hoyt*, 53 Ohio St.3d 177, 182, 559 N.E.2d 1292 (1990).

{¶ 26} In this case, the risk that Adilson would quit his employment materialized and the unvested Splunk RSUs were cancelled. Because the Splunk RSUs did not vest,

11.

the Splunk stocks never transferred to Adilson and there was nothing to divide between the parties. Notably, in the divorce judgment the trial court could have ordered Adilson to pay Emily some amount of the cancelled RSUs in the event that his employment at Splunk ended before the RSUs vested, but it did not. Therefore, while Emily is correct that the unvested RSUs had some value as marital property at the time of the divorce judgment, she was only entitled to receive value from those RSUs "at the time of their vesting." However, in this case, the RSUs did not vest and were cancelled. Consequently, they no longer had any value and the trial court did not err in so concluding.

{¶ 27} This leads to Emily's second argument that the trial court's judgment is inequitable because it allows Adilson to receive the benefit of the unvested Splunk RSUs while she receives nothing. Emily has advanced several theories supporting why she should be entitled to relief. In the trial court, she pursued both a theory of contempt of court and a theory of financial misconduct under R.C. 3105.171(E)(4) ("If a spouse has engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, nondisclosure, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property."). On appeal, she again cites financial misconduct under R.C. 3105.171(E)(4) and adds a claim of violation of equitable principles.

{¶ 28} Regardless of the theory, the crux of Emily's claim is that Adilson leveraged the value of the unvested Splunk RSUs to secure a compensation package from

12.

Salesforce that included $500,000 worth of Salesforce RSUs. Emily necessarily tethers the unvested Splunk RSUs to Adilson's Salesforce compensation package to explain away the reality that when Adilson left Splunk, he also lost out on the value of the unvested RSUs. Emily contends that Adilson did not actually lose out on the value, but instead Salesforce specifically took it into account when it offered its compensation package to Adilson. In the trial court, Emily suggested that Adilson "conspired" with Salesforce. She now asserts, however, that while Adilson may not have acted with malice, he has nonetheless "traded-in" or "leveraged" the Splunk RSUs.

{¶ 29} Emily's contention is unsupported by the record. Based on Adilson's testimony, the trial court found that he left Splunk because of changes in leadership at the company and uncertainty regarding his future. At the time, Adilson was being recruited by several other companies and received an offer from Salesforce where he would be working with a former colleague. Adilson's testimony establishes that Salesforce's offer was typical for someone in his position. Further, the e-mail exchange between Adilson and the Salesforce executive does not contain any mention of Splunk or unvested RSUs, but simply contains the details of the offer that they had discussed. Importantly, there is nothing in the record to suggest that Adilson intended to dissipate the value of the unvested Splunk RSUs and replace them with Salesforce RSUs. Thus, the record does not demonstrate that Adilson "traded-in" or "leveraged" the Splunk RSUs to receive his compensation package from Salesforce. Consequently, this is simply a case where the risks inherent in the deferred distribution of marital assets happened to materialize.

13.

**{¶ 30}** Finally, it is worth noting that Emily was not left completely empty-handed following Adilson's move to Salesforce. Considering the award of RSUs, the difference in income between the parties, and the fact that "[d]ue to [Adilson's] career change, several RSUs were cancelled, RSUs that may have continued to vest through 2023, and [Emily] would have received one half the value of any RSUs that did vest," the trial court extended the $6,700.00 monthly spousal support award for another 27 months through December 31, 2023.[2]

**{¶ 31}** In consideration of the above, the trial court did not err when it held that Emily was not entitled to any compensation for the cancelled, unvested Splunk RSUs.

**{¶ 32}** Accordingly, Emily's assignment of error is not well-taken.

### B. Adilson's Assignment of Error on Cross-Appeal

**{¶ 33}** In Adilson's assignment of error on cross-appeal, he contends that the trial court erred in its division of funds contained in the parties' respective attorneys' IOLTA accounts. Specifically, he argues that the trial court erred in its conclusion that he was solely responsible for the parties' 2018 tax liability. Because Adilson failed to object to the magistrate's decision on this issue, he has waived this argument on appeal.

**{¶ 34}** "Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not

---

[2] The original order of spousal support was through March 2021. The parties then agreed to extend it through September 2021. In its judgment entry, the court extended it for a final time through December 2023.

specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party has objected to that finding or conclusion as required by Civ.R. 53(D)(3)(b)." Civ.R. 53(D)(3)(b)(iv). "Thus, in a civil case before a trial court, when a party fails to file objections to a magistrate's decision, that party waives the right to later assign as error on appeal the court's adoption of any of the magistrate's findings and conclusions." *State ex rel. Franks v. Ohio Adult Parole Auth.*, 159 Ohio St.3d 435, 2020-Ohio-711, 151 N.E.3d 606, ¶ 9; *Wilson v. Wilson*, 2018-Ohio-3820, 111 N.E.3d 110, ¶ 27 (6th Dist.).

**{¶ 35}** In her decision, the magistrate determined that neither party was entitled to funds from the other's IOLTA account because Emily improperly used her funds to pay off the mortgage and give Adilson his share of the equity in the home, and Adilson improperly used his funds to pay the 2018 tax liability. The magistrate determined that the parties' actions resulted in a "wash." Adilson did not object to the magistrate's conclusions.

**{¶ 36}** In reviewing the magistrate's decision, the trial court determined that the parties' respective improper payments out of their IOLTA accounts was not a "wash" because Emily had paid $9,942.01 towards the 2018 tax liability, which was Adilson's sole responsibility. Thus, the trial court ordered Adilson to reimburse her the $9,942.01.

**{¶ 37}** Because Adilson did not object to the magistrate's conclusion that the 2018 tax liability was his sole responsibility, he has waived all but plain error. However, Adilson has not asserted a claim for plain error. He, therefore, "has waived *any* alleged

15.

error on appeal." (Emphasis sic.) *Wilson* at ¶ 35, citing *State v. Perkins*, 9th Dist. Medina No. 17CA0048-M, 2018-Ohio-2240, ¶ 8.

{¶ 38} Accordingly, Adilson has waived the argument contained in his assignment of error on cross-appeal, and that assignment of error is not well-taken.

### IV. Conclusion

{¶ 39} For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas, Domestic Relations Division, is affirmed. Costs of this appeal are ordered to be split evenly between the parties pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.

Charles E. Sulek, J.

David A. D'Apolito, V.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

Judge David A. D'Apolito, Seventh District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

16.